NICHOLS (UNITED STATES v.). See Case No. 15,880.

NILES (ROSE v.). See Case No. 12,050.

## Case No. 10,266.

NIMICK et al. v. MUTUAL LIFE INS. CO.

[10 Am. Law Reg. (N. S.) 101; 3 Brewst. 502; 18 Pittsb. Leg. J. 164; 3 Pittsb. Rep. 293; 1 Bigelow, Ins. Rep. 689.]

Circuit Court, W. D. Pennsylvania. Jan. 11, 1871.

LIFE INSURANCE—SUICIDE OF INSURED—INSANITY.

[1. Insanity being an exceptional condition of mind, the legal presumption is that every one is of sound mind until the contrary is proved by sufficient affirmative evidence.

[2. Under a policy conditioned to be void in case the assured should "die by his own hand," there can be no recovery in case of suicide, if the assured, at the time of committing the act which resulted in death, had sufficient powers of mind and reason to understand the physical nature and consequences of such act, irrespective of the question whether he was capable of understanding its moral nature and quality. Following Dean v. American Mut. Life Ins. Co., 4 Allen, 98.]

[Cited in brief in Mutual Life Ins. Co. v. Terry, 15 Wall. (82 U. S.) 586.]

[Cited in Van Zandt v. Mutual Benefit Life Ins. Co., 55 N. Y. 177.]

This was an action upon a policy of life insurance [by Alexander Nimick and others against the Mutual Life Insurance Company.]

John Barton, J. H. Bailey, and W. C. Chalfant, for plaintiff, cited Breasted v. Farmers' Loan & Trust Co., 4 Hill, 73, 8 N. Y. 299; Estabrook v. Union Mut. Life Ins. Co., 54 Me. 224; St. Louis Mut. Life Ins. Co. v. Graves [6 Bush, 268], Ct. App. Ky.; and 1 Phil. Ins. §§ 896, 1162.

Geo. Shiras, Jr., J. M. Stoner, and Mr. Patterson, for defendants, cited Borradaile v. Hunter, 5 Man. & G. 639; Clift v. Schwabe, 3 C. B. 437; Dean v. American Mut. Life Ins. Co., 4 Allen, 96.

McKENNAN, Circuit Judge (charging jury). This suit is brought by the assignees of H. C. Benham to recover from the Mutual Benefit Life Insurance Company the sum of $5000, which it agreed to pay at the death of Benham, upon certain conditions, set forth in the policy of insurance on which the suit is founded. The defendants, by their plea, admit all the essential facts alleged in the declaration, and they are, therefore to be assumed as fully proved, and the plaintiff's right primarily to recover as established. But this admission is covered with an averment that the assured "died by his own hand." Upon this ground the plaintiff's recovery is resisted. This allegation is denied by the plaintiffs, and they further reply that Benham, at the time of his death, was of unsound mind. Evidence has been produced on both sides touching the manner of Benham's death, and his mental condition at the time. Of the sufficiency of this you are to judge, under the instructions presently to be given. Upon the party who affirms an essential fact devolves the burden of proving it. It is incumbent on the defendants, then, to

convince you that the assured was the wilful destroyer of his own life. On the proof of this the defence must stand or fall. So, if this fact is satisfactorily shown, it is the duty of plaintiffs to make out the allegation that the assured was insane. Insanity is an exceptional condition of the mind, and the legal presumption, therefore, is that every one is of sound mind until the contrary is proved by sufficient affirmative evidence.

You will then inquire, in the first place, as to the manner in which the assured came to his death. Did he take his own life, or was it taken by others? Was his death voluntary or accidental? If you find that it resulted from his own act you will then consider the state of his mind, as it affected the exercise of his will, and a comprehension of the physical consequences of the act, aside from its moral character. I do not deem it at all pertinent to the practical solution of the question to invite a discriminating scrutiny of the opinions of the excellent professional gentlemen who have differed so widely in judgment upon the same statement of facts as to the sanity of the assured. It would furnish you no assistance in reaching a conclusion within the range which the law prescribes as the limit of your inquiry. How far it is necessary or proper for you to go in this direction, I proceed to state more fully, in answer to the points submitted by the counsel on both sides. The provision in the policy is in these words: "Or in case he shall die by his own hand * * * this policy shall be void, null, and of no effect." Literally interpreted, these words import death under all circumstances caused by the act of the assured, whether intentional or accidental. Some relaxation of their strict sense, however, is required by the nature of the contract, to effectuate the intention and object of the parties, but no qualification of them, not necessary to this end, is warrantable. They are intended to protect the insurer against the consequence of the physical act of the assured. They refer distinctly to the physical agency by which death may be caused; only by implication, quite speculative, to the moral sensibility of the agent. Their sense, then, is entirely satisfied by expounding them as describing an act of the assured resulting in his death, as an intended consequence of it, irrespective of his understanding of its moral nature.

Adopting the language of Erskine, J., in Borradaile v. Hunter, 5 Man. & G. 639, "It seems to me that the only qualification that a liberal interpretation of the words, with reference to the nature of the contract, requires, is that the act of self-destruction should be the wilful act of a man having, at the time, sufficient powers of mind and reason to understand the physical nature and consequences of such act, and having, at the time, a purpose and intention to cause his own death by that act; and that the question whether, at the time, he was capable of understanding and appreciating the moral nature and quality of his purpose is not relevant to the inquiry further than as it might illustrate the extent of his capacity to understand the physical character of the act itself;" and also the words of Bigelow, C. J., delivering the unanimous judgment of the supreme court of Massachusetts in Dean v. American Mut. Life Ins. Co., 4 Allen 98: "Applying, then, the first and leading rule by which the construction of a contract is regulated, and governed, we are to inquire what is a reasonable interpretation of this clause, according to the interest of the parties. It certainly is very difficult to maintain the proposition that, where parties reduce their contract to writing, and put their stipulations into clear and unambiguous language, they intended to agree to anything different from that which is plainly expressed by the terms used. It is, however, to be assumed that every part of a contract is to be construed with reference to the subject-matter to which it relates, and with such limitations and qualifications of general words and phrases as properly arise and grow out of the nature of the agreement in which they are found. Giving full force and effect to this rule of interpretation, we are unable to see that there is anything unreasonable or inconsistent with the general purpose which the parties had in view in making and accepting the policy, in a clause which excepts from the risks assumed thereby, the death of the assured by his own hand, irrespective of the condition of his mind as affecting his moral and legal responsibility at the time the act of self-destruction was consummated. Every insurer, in assuming a risk, imposes certain restrictions and conditions upon his liability. Nothing is more common than the insertion in policies of insurance of exceptions by which certain kinds or classes of hazards are taken out of the general risk which the insurer is willing to incur. Especially is this true in regard to losses which may arise or grow out of an act of the party insured. Such exceptions are founded on the reasonable assumption that the hazard is increased when the insurance extends to the consequences which may flow from the acts of the person who is to receive a benefit to himself or confer one on others by the happening of a loss within the terms of the policy. Where a party secures a policy on his life, payable to his wife or children, he contemplates that, in the event of his death, the sum insured will inure directly to their benefit. So far as a desire to provide, in that contingency, for the welfare and comfort of those dependent upon him can operate on his mind, he is open to the temptation of a motive to accelerate a claim for a loss under the policy by an act of self-destruction. Against the increase of the risk arising from such a cause, it is one of the objects of the proviso in question to protect the insurers. Although the assured can derive no pecuniary

advantage to himself by hastening his own death, he may have a motive to take his own life, and thus to create a claim under the policy in order to confer a benefit on those who, in the event of his death, will be entitled to receive the sum insured on his life. Unless, then, we can say that such a motive cannot act on a mind diseased, we cannot restrict the words of proviso so as to except from the risk covered by the policy only the case of criminal suicide, where the assured was in a condition to be held legally and morally responsible for its acts. It certainly would be contrary to experience to affirm that an insane person cannot be influenced and governed in his actions by the ordinary motives which operate on the human mind. Doubtless there may be cases of delirium or having madness where the body acts only from frenzy or blind impulse, as there are cases of idiocy or the decay of mental power, in which it acts only from the promptings of the lowest animal instincts. But in the great majority of cases where reason has lost its legitimate control, and the power of exercising a sound and healthy volition is lost, the mind still retains sufficient power to supply motives and exert a direct and essential control over their actions. In such cases the effect of the disease often is to give undue prominence to surrounding circumstances and events, and, by exaggerating their immediate effects or future consequences, to furnish incitement to acts of violence and folly. A person may be insane, entirely incapable of distinguishing between right and wrong, and without any just sense of moral responsibility, and yet retain sufficient powers of mind and reason to act with premeditation, to understand and contemplate the nature and consequence of his own conduct, and to intend the results which his acts are calculated to produce. Insanity does not necessarily operate to deprive its subjects of their hopes and fears, or the other mental emotions which agitate and influence the minds of persons in the full possession of their faculties. On the contrary, its effect often is to stimulate certain powers to extraordinary and unhealthy action, and thus to overwhelm and destroy the due influence and control of the reason and judgment. Take an illustration: A man may labor under the insane delusion that he is coming to want, and that those who look to him for support will be subjected to the ills of extreme poverty. The natural effect of this species of insanity is to create great mental depression, under the influence of which the sufferer, with a view to avoid the evils and distress which he imagines to be impending over himself and those dependent upon him for support, is impelled to destroy his own life. In such a case suicide is the wilful and voluntary act of a person who understands its nature, and intends by it to accomplish the result of self-destruction. He may have acted from an insane impulse which prevented

him from appreciating the moral consequences of suicide; but nevertheless may have fully comprehended the physical effect of the means which he used to take his own life, and the consequences which might ensue to others from the suicidal act. It is against risks of this nature—the destruction of life by the voluntary and intentional act of the party assured—that the exception in the proviso is intended to protect the insurers. The moral responsibility for the act does not affect the nature of the hazard. The object is to guard against loss arising from a particular mode of death. The causa causans, the motive or influence which guided or controlled the will of the party in committing the act, are immaterial as affecting the risk which the insurers intended to except from the policy. This view is entirely consistent with the nature of the contract. It is the ordinary case of an exception of a risk which would otherwise fall within the general terms of the policy. These comprehended death by disease, either of the body or brain, from whatever cause arising. The proviso exempts the insurers from liability when life is destroyed by the act of the party insured, although it may be distinctly traced as the result of a diseased mind. It may well be that insurers would be willing to assume the risk of the results flowing from all diseases of the body, producing death by the operation of physical causes, and yet deem it expedient to avoid the hazards of mental disorder, in its effects upon the will of the assured, whether it originated in bodily disease or arose from external circumstances, or was produced by a want of moral and religious principle."

I have appropriated so much of these opinions because they could not be abridged without impairing the completeness of the argument presented by them with so much force and clearness. They declare what is now, upon the fullest discussion and consideration, and after repeated decisions, the settled law of England, and of one of the most respectable judicial tribunals in the United States. I am not unmindful that there is some diversity of adjudication in reference to this question; but, in my judgment, the weight of authority, as well as of reason and argument, is decidedly in favor of the construction adopted. We must not forget that we are dealing with a contract, reduced to writing, and founded upon the assent of both parties to it. It is our imperative duty, then, to expound and enforce it as the parties themselves have made and declared it to be, not as we might think it ought to have been made. If you are not satisfied, by the evidence, that Horace C. Benham came to his death by his own hand, you will find for the plaintiffs the amount claimed by them in this suit. If, however, you believe from the evidence that he committed self-destruction, that he intended to destroy his life, and comprehended the physical nature and consequences

of his act, the plaintiffs are not entitled to recover, and your verdict should be for the defendant.

The jury found a verdict for plaintiffs for $5,440.